(C. D. 1315)

R. W. Cramer Co., Inc. *v.* United States

United States Customs Court, Second Division

(Decided March 22, 1951)

*Barnes, Richardson & Colburn (Eugene F. Blauvelt* of counsel) for the plaintiff. *David N. Edelstein,* Assistant Attorney General (*Arthur R. Martoccia* and *Richard F. Weeks,* special attorneys), for the defendant.

Before LAWRENCE and RAO, Judges; FORD, J., not participating

LAWRENCE, Judge: Certain merchandise described on the consular invoice accompanying the entry covered by this protest as "Allen's 36% Cobalt Steel Permanent Magnets" was classified by the collector of customs as parts of subsynchronous motors of less than one-fortieth of one horsepower valued at not more than $3 each within the purview of paragraph 368 (a) (c) (6) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 368 (a) (c) (6)), and subjected to duty at the rate of 65 per centum ad valorem.

Various claims for relief were made by plaintiff in its protest but the only one relied upon at the hearing of the case was that the merchandise should properly have been classified as articles or wares not specially provided for, composed of metal, as enumerated in paragraph 397 of said act (19 U. S. C. § 1001, par. 397), dutiable at the rate of 45 per centum ad valorem.

The pertinent portions of paragraph 368 (a) and (c) (6), *supra,* are here set forth:

PAR. 368. (a) * * * synchronous and subsynchronous motors of less than one-fortieth of one horsepower valued at not more than $3 each, not including the value of gears or other attachments, * * *

* * * * * * *

(c) * * *
(6) all other parts (except jewels), 65 per centum ad valorem.

The case was submitted upon certain exhibits and the testimony of Eugene L. Schellens, who stated that he was vice president in charge of engineering and manufacturing in the plant of R. W. Cramer Co., Inc., having held that position for 10 years; that he held the degree of mechanical engineer from McGill University in Montreal, Canada, from which he was graduated in 1916, and that since that time he had been continuously engaged in the engineering profession; that the business of the Cramer Co. was the "Manufacture of electrical devices, mainly relays and small motors, small synchronous motors"; that he was familiar with the importation which forms the subject of this controversy; and that the three articles attached to a tag represented the merchandise described on the invoice. They were received in evidence as collective exhibit 1. The articles are flat, circular, thin pieces of steel, about 1⅛ inches in diameter, deeply notched around the perimeter, and with a hole in the center about one-quarter of an inch in diameter. The witness produced an article which was said to represent one of the motors manufactured by the Cramer Co., in the

fabrication of which pieces of metal like collective exhibit 1, after further processing, were utilized. It was received in evidence as exhibit 2.

It appears from the testimony of Mr. Schellens that at the time of importation collective exhibit 1 was not magnetized; that before incorporating it into a motor "The first operation consisted in grinding the faces of the rough material in order to make the dimension accurate"; that a sample, which was received in evidence as exhibit 3, represented the appearance of collective exhibit 1 after being ground on both faces and "on the outside" (apparently having reference to all its exposed portion). The article then has what is termed a bushing pressed into the center, which is then "* * * trued in a lathe by ripping apart in the lathe and truing this hole in order to cause the magnet to rotate accurately on the center." The witness testified that the next step in the treatment of exhibit 3 "* * * is the assembly of another related part consisting of a shaft and a gear." After this operation, the part is magnetized. "* * * That is accomplished with a special apparatus, electronically actuated, which is specifically adapted to this particular magnet of this geometric form"; that the article received in evidence as exhibit 4 was permanently magnetized, and apparently represents exhibit 3 after the shaft and gear have been assembled.

It is clear from the evidence that after importation the merchandise illustrated by collective exhibit 1 is ground and polished, and when a bushing is inserted in the center it appears in the condition represented by exhibit 3. The next step in its development is the insertion of a shaft and gear, represented by exhibit 4. In that form it is magnetized and incorporated in a motor such as exhibit 2, which the witness stated is "used for timing instruments of various types, time switches, time delay relays, and almost entirely on industrial equipment for controlling press operations, and laundry operations, and similar uses."

It was stipulated that the articles in collective exhibit 1 are composed of steel, not plated with platinum, gold, or silver, nor covered with gold lacquer.

On cross-examination, the witness admitted that 99.99 per centum of articles like collective exhibit 1 were being used for synchronous motors, and, when asked if he knew of their commercial use other than as rotors for synchronous motors, he replied, "I do not."

X Q. And these parts, Exhibit 1, are essential for the proper construction and operation of synchronous motors like Exhibit 2; is that correct?—A. These, or identical parts.

X Q. They are essential parts?—A. Yes.

X Q. Incidentally, is Exhibit 2 less than one-fortieth horsepower, do you know?—A. Yes.

X Q. And valued at less than three dollars?—A. Generally, yes.

In the examination of the witness counsel have apparently used the terms "synchronous" and "subsynchronous" motors indiscriminately. However, this would seem to be a matter of no consequence, inasmuch as the rate of duty specified in paragraph 368, *supra*, is the same on both types of motors.

The salient facts of record to which reference has been made present for our consideration the question whether the imported articles represented by collective exhibit 1 were properly classified by the collector of customs as unfinished "parts" of subsynchronous motors or whether they should be treated as mere material for manufacture into parts of motors and, therefore, properly dutiable as articles or wares not specially provided for, composed of steel.

Whether an article falls within a particular designation in a tariff law must be ascertained by an examination of the imported article itself in the condition in which it is imported, or from other evidence as to its character and intended use. *Worthington* v. *Robbins*, 139 U. S. 337, at 340.

That the articles in their imported condition are "parts"; that they are essential for the proper construction and operation of motors like exhibit 2 and have no other commercial use than as rotors of synchronous motors appears to be frankly admitted by the witness representing the importer. Samples of merchandise have frequently been held by the courts to be potent witnesses (*United States* v. *May Department Stores Co.*, 16 Ct. Cust. Appls. 353, T. D. 43090, and *United States* v. *F. W. Woolworth Co.*, 23 C. C. P. A. (Customs) 234, T. D. 48083). An examination of the exhibits before us definitely indicates that the imported merchandise represented by collective exhibit 1 bears all the earmarks and indicia of its intended use.

The testimony of the witness, together with an inspection of collective exhibit 1, clearly brings the article within the definition of "parts," as judicially defined, being essential and constituent (although unfinished) parts necessary for the proper operation of the motor in which they are to be incorporated.

Plaintiff places considerable reliance upon the case of *Plaza Music Co.* v. *United States*, 41 Treas. Dec. 261, T. D. 39098, wherein the Board of General Appraisers (now known as the United States Customs Court) held that certain circular disks, not bored, composed of mica, and used as material in the construction of phonographic reproducers, were not dutiable as parts of phonographs, but were properly classified as "manufactures of mica" or of which mica was the component material of chief value. A careful analysis of the facts in that case will disclose that it differs in vital factual respects from the case at bar. For instance, in the *Plaza* case, *supra*, the board recites that:

In his advisory return, the local appraiser reports the merchandise as consisting of "circular disks, not bored, composed of mica, and  *  *  *  *not sufficiently manufactured to be identified as parts* of phonographs." [Italics supplied.]

In the case before us, however, the articles in their imported condition are sufficiently manufactured to be readily identified as unfinished parts of subsynchronous motors. An examination of exhibits 1, 3, and 4 shows that the identifying characteristics of collective exhibit 1 are retained throughout the finishing processes. Since the form and character of collective exhibit 1 clearly identify the use for which it is dedicated, a basic element or factor is presented here which was lacking in the *Plaza* case, *supra.* The same circumstances differentiate the case at bar from *J. M. Lehmann Co., Inc.* v. *United States*, 70 Treas. Dec. 188, T. D. 48474, wherein certain metal articles were held not to be parts of machines for the reason that there was no evidence that the articles were "designed for" and ultimately incorporated in any *particular machine* as an essential and indispensable part without which the machine could not function as such for the purpose for which it was designed.

We are of the opinion that the principles of decision which should guide us here are to be found in the cases of *United States* v. *Lyon & Healy*, 4 Ct. Cust. Appls. 438, T. D. 33873, and *Waltham Watch Co.* v. *United States (Jaeger Watch Co., Inc., Party in Interest)*, 25 C. C. P. A. (Customs) 330, T. D. 49425.

In the *Lyon & Healy* case, *supra*, the merchandise consisted in part of violin and cello necks which, before importation, had been cut to shape but were not polished or fitted, nor did they have holes bored through them for the keys for the violin strings. In its opinion the court stated: "They are, however, so far shaped as to indicate *per se*, as imported, their ultimate use, and that by reason of their shape and condition as imported they are unfit for any other use." The question before the court for consideration in that case was whether the articles above described were properly dutiable as "parts of musical instruments." The court observed that "If the merchandise is to be used in the make-up of musical instruments, becoming a part thereof, they are dutiable under this provision; otherwise not." It then stated that:

* * * The test of whether or not in the condition imported they are to be classified as such for dutiable purposes has been clearly defined by this court and the Supreme Court in adjudicating language almost precisely the same as that before this court. We said:

In order to bring any material for manufacturing within a tariff designation which covers one of its ultimate uses it should be so far advanced by the processes applied thereto in the line of that particular ultimate use that, either from an examination *per se* evidences of its ultimate use are made clear or so far advanced that its utility in any of its other possible uses shall have been destroyed. Athenia Steel & Wire Co. v. United States (1 Ct. Cust. Appls., 494, 495; T. D. 31528).

The court there applied the doctrine of the Supreme Court of the United States in *Worthington* v. *Robbins*, 139 U. S. 337, and held that the violin and cello necks above described were properly dutiable as "parts of musical instruments," even though unfinished.

In the *Waltham Watch Co.* case, *supra,* the question presented was whether *unfinished* pillar or bottom plates fell within the provision for "pillar or bottom plates, or their equivalent" in paragraph 367 (c) (2) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 367 (c) (2)) which contains no express provision for *unfinished* pillar or bottom plates. In a thoroughgoing opinion, the court concluded that the provision for pillar or bottom plates in said paragraph 367 included such articles whether finished or unfinished.

In its opinion the appellate court pointed out that—

> The trial court also stressed the fact that in subparagraph (f) of said paragraph 367, provision is made for "All cases, containers, or housings, designed or suitable for the enclosure of any of the foregoing movements, * * * whether finished or unfinished," and also that a provision containing the term "finished or unfinished" is found in paragraph 368, the clock paragraph. The court stated that it regarded it as significant that in paragraph 367 Congress provided for only one class of unfinished articles—casings, containers and housings, and that under the rule of *expresio unius est exclusio alterius* it was compelled to hold that unfinished pillar or bottom plates or their equivalents were not covered by said subparagraph (c) (2). * * *

The court stated that what Congress may have meant by the inclusion of the term "finished or unfinished" in subparagraph (f) of paragraph 367, or why it was omitted from other provisions of the paragraph, would be mere speculation. "But," the court said, "we are sure that the fact alone that it was included in subparagraph (f) and omitted elsewhere in the numerous provisions of the paragraph, is not persuasive that Congress intended only completed articles to be dutiable under subparagraph (c) (2). So to hold, in our judgment, would not only do violence to the paragraph as a whole but to many other provisions of the tariff act. All that would be necessary to do to avoid classification under paragraph 367, except for the articles provided in subparagraph (f), would be to omit some part or to fail to completely finish the same."

Further in its opinion the court pointed out that:

> Many of the paragraphs of the tariff act can be pointed to where the term "finished or unfinished" or its equivalent is omitted and where a holding such as is contended for here by the party in interest would be calculated to completely destroy the provisions. * * * For instance, typewriters could not enter free unless they were complete articles, and the free entry of master records and sound records would also be affected. What effect such a holding would have on the free list provisions and the dutiable provisions for works of art would be difficult at this time to foresee.

The appellate court was not impressed with the reasoning of the trial court and, as above indicated, held that the provision for pillar

·or bottom plates, unqualified, included those articles whether finished ·or unfinished.

We are of the opinion that the interpretation of the provisions of paragraph 367, *supra*, which was adopted by the court in the *Waltham* ·case, *supra*, should apply with equal force to the language of paragraph 368 with which we are here concerned.  Whereas subparagraph (f) of paragraph 367, *supra*, provides for cases, containers, or housings, finished or unfinished, subparagraph (g) of paragraph 368 contains a provision for taximeters, finished or unfinished.  Inasmuch as the ·other provisions in paragraph 367 were interpreted to include articles, finished or unfinished, a like construction must be given to the other subparagraphs in paragraph 368.  Therefore, we hold that the provision in subparagraph (c) (6) of paragraph 368 is a provision for "parts" whether finished or unfinished.

It may be noted that in the *Waltham* case, *supra*, the court referred with obvious approval to its earlier decision in *United States* v. *Lyon & Healy*, which has been discussed above.

Applying the principles of the two cases just cited, we hold:

(1)  That the provision for "parts" in said paragraph 368 (c) (6) includes parts either finished or unfinished, and

(2)  That the imported steel pieces are unfinished parts of subsynchronous motors and properly dutiable at the appropriate rate pursuant to paragraph 368 (a) (c) (6), as classified by the collector ·of customs.

All claims of the plaintiff are, therefore, overruled and judgment will be entered accordingly.